# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>SCOTT I. LONDON | DOCKET NO.<br>**13-1058M** |
|---|---|
| | MAGISTRATE'S CASE NO.<br>13- |

FILED
CLERK U.S. DISTRICT COURT

APR 11 2013

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

Complaint for violation of 18 U.S.C. § 371 (conspiracy to commit securities fraud through insider trading)

| NAME OF MAGISTRATE JUDGE<br>Charles F. Eick | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>November 2010 through May 2012 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning in or about at least November 2010 and continuing up through in or about May 2012, within the Central District of California, and elsewhere, defendant SCOTT LONDON knowingly combined, conspired, and agreed to commit securities fraud through insider trading in violation of 18 U.S.C. § 371.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

**See attached affidavit which is incorporated as part of this Complaint**

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Jeremy R. Tarwater /s/ |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT – FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>**CHARLES F. EICK** | DATE<br>April 11, 2013 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

[AUSA:James A.Bowman, Major Frauds Section]      REC: $50,000 Secured Bond

**A F F I D A V I T**

I, Jeremy R. Tarwater, being duly sworn, do hereby depose and say:

## I.   INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since March 2008.  I am currently assigned to the Los Angeles Division of the FBI.  I specialize in the investigation of white collar crime, including but not limited to securities fraud, mail fraud, wire fraud, and money laundering.  I received formal training at the FBI Academy at Quantico, Virginia, in 2007 and 2008.  My training included, but was not limited to, the investigation of various types of financial crimes, including securities fraud.

2.      Before joining the FBI, I received a law degree from Georgetown University Law Center in 2001.  From 2001 until 2007, I worked as an associate at Latham & Watkins LLP and Farella, Braun, & Martel LLP.  My practice at these law firms was primarily focused on securities law, capital markets (including initial public offerings), mergers and acquisitions, and other corporate representation matters.

3.      From approximately January 2013 through the present, I have been the primary case agent responsible for the investigation of alleged insider trading by SCOTT LONDON and Bryan Shaw.  As further described below, as part of my involvement with this investigation, I have, among other things: (a) reviewed bank and brokerage records for accounts owned and controlled by Shaw; (b) analyzed telephone records for telephones used by LONDON and Shaw; (c) conducted surveillance of LONDON and Shaw and reviewed reports of surveillance of them by other FBI agents involved in the investigation; (d) interviewed LONDON, Shaw, and various other witnesses with personal knowledge about matters relevant to the investigation; and

1

(e) listened to covert recordings that Shaw made at the FBI's request of various conversations between LONDON and Shaw.

## II.   **PURPOSE OF THIS AFFIDAVIT**

4.      This affidavit is written in support of an application for a criminal complaint charging LONDON with conspiracy to commit securities fraud through insider trading, in violation of Title 18, United States Code, Section 371, as well as a request to issue a summons for LONDON's immediate appearance pursuant to Federal Rule of Criminal Procedure 4(a).

5.      The purpose of this affidavit is solely to set forth the facts necessary to establish probable cause to believe that LONDON committed a violation of Title 18, United States Code, Section 371, as charged in the complaint.  Accordingly, the statement of facts below is not meant to be a complete recitation of all facts relevant to the criminal conduct described herein, or all the facts known to me that relate to the conduct.  Except where I have expressly indicated that facts listed below are based on information and belief, I have personal knowledge of the stated facts and, if called as a witness, could and would testify competently to them.  Where figures and calculations are set forth in this affidavit, they are approximate.

## III.   **OVERVIEW**

6.      The investigation to date reveals that LONDON passed material, non-public information about KPMG LPP ("KPMG") clients to Shaw, who was his friend, over a period of several years, and that Shaw used this information to make highly profitable securities trades that generated more than $1 million in illegal profits.  During the time period relevant to this complaint, LONDON was a senior partner at the accounting firm KPMG, in charge of KPMG's audit services practice for KPMG's Pacific Southwest region, including Southern California,

Arizona, and Nevada.  LONDON supervised more than 50 audit partners and over 500

accounting professionals at KPMG, and personally handled audits for major KPMG clients,

including Herbalife Ltd. ("Herbalife").  From at least 2010 and continuing into March 2013,

LONDON disclosed confidential information about KPMG clients to Shaw, and Shaw secretly

gave LONDON tens of thousands of dollars in cash, jewelry, concert tickets, and other things of

value in exchange for the information.  As is detailed below, LONDON provided confidential

information to Shaw that included specific details about earnings and guidance information for

certain KPMG clients, before that information was disclosed to the public.  On other occasions,

LONDON disclosed to Shaw confidential information about impending mergers concerning

certain KPMG clients before that information was disclosed to the public.  In some instances,

LONDON discussed with Shaw how to structure Shaw's purchases of stock in those companies

in order to avoid detection of their conspiracy.  After Shaw admitted his conduct to federal

authorities, Shaw cooperated with the government's investigation and recorded his conversations

with LONDON in which LONDON continued to disclose confidential information about KPMG

clients.  Acting at the direction of the FBI, Shaw also made two separate cash payments of

$5,000 to LONDON as supposed payment for confidential information that LONDON had

disclosed to Shaw in February 2013 regarding earnings and guidance announcements for KPMG

clients Herbalife and Deckers Outdoor Corporation ("Deckers").  A surveillance photograph of

LONDON accepting one of the $5,000 cash payments in a parking lot is attached to this

complaint as Exhibit A.

IV.  **PROBABLE CAUSE**

    A.  **Analysis of Records Reflecting Suspiciously Timed Securities Trades by Shaw**

    7.  In the course of the investigation, I obtained and reviewed various records, including, among other things, bank and stock brokerage records for Shaw, telephone records for LONDON and Shaw, and records reflecting securities trades for certain stocks over certain time periods. I also reviewed analyses of certain records that were prepared by other FBI agents. These records included, but were not limited to, the following:

    a.  Verizon Wireless records for account XXXXX9732-00001 pertaining to a cellular telephone subscribed to, and used by,[1] LONDON, and Verizon Wireless records for account XXXXX82741 pertaining to a cellular telephone subscribed to, and used by, Shaw.

    b.  Accounts held at Fidelity Investment Services, within their Fidelity Private Client Group, including records for account number XXX-XX2226 which was held in the name of Shaw (the "Fidelity investment account"). I further viewed account opening documents pertaining to the Fidelity investment account and noted that Shaw was listed as the sole account holder on the account.

    c.  Records of securities trades for certain issuers over certain time periods (known as "blue sheet records"). These included blue sheet records for certain time periods for the following publicly-traded companies: Herbalife, Deckers, RSC Holdings, Inc. ("RSC Holdings"), and Pacific Capital Bancorp ("Pacific Capital Bancorp").

---

[1] As detailed below, Shaw later made several consensually recorded telephone calls to LONDON, who was using this cellular telephone.

d.      Publicly available documents, including regulatory filings with the United States Securities and Exchange Commission (the "SEC"), press releases from certain companies (including Skechers USA, Inc. ("Skechers") and the other public companies listed immediately above), and information regarding historical stock prices for the stocks of Skechers and the public companies listed immediately above.

8.      Based on these records, as further described below, I determined that Shaw generated substantial profits from suspiciously timed trades in the stocks of Herbalife, Deckers, Skechers, RSC Holdings, and Pacific Capital Bancorp.  These trades included, but were not limited to, the following:

(1)    <u>Shaw's Suspicious Trades in Herbalife from March 2011 through May 2011</u>

9.      During the time period relevant to this complaint, Herbalife was a publicly-traded company listed on the New York Stock Exchange ("NYSE") under the stock ticker symbol "HLF."  On May 2, 2011, Herbalife announced record earnings for the first fiscal quarter of 2011 and raised its guidance for the 2011 fiscal year.  As a result, the price of Herbalife's stock increased nearly $6, from $45.12 per share to $51.11 per share by the end of the following day.

10.     Records that I reviewed in this investigation reflect that Shaw made substantial purchases of Herbalife stock shortly before the company's May 2, 2011, earnings announcement.  Specifically, brokerage records reflect that, after a series of telephone calls between LONDON's cellular telephone and Shaw's cellular telephone in early March 2011, including a telephone call on March 9, 2011, Shaw began on March 9, 2011 to purchase call options in Herbalife stock in

5

the Fidelity investment account.[2]  Additional records reflect that after an additional series of telephone calls between LONDON and Shaw in mid-April 2011, Shaw purchased additional call options in and shares of Herbalife stock.  Shaw continued to buy call options in Herbalife up to and including May 2, 2011.

11.    I also reviewed records which reflect that after Herbalife made its earnings announcement on May 2, 2011 and the stock market had closed for the day, Shaw then began liquidating Herbalife call options that he had purchased before the announcement.  Specifically, Shaw sold Herbalife options between May 3, 2011 and May 24, 2011, generating more than $450,000 in profits from his securities trades in Herbalife before and after the May 2, 2011 earnings announcement.

(2)    Shaw's Suspicious Trades in RSC Holdings in December 2011

12.    During the time period relevant to this complaint, RSC Holdings was an equipment rental company that was listed on the NYSE under the stock ticker symbol "RRR," before it was acquired by another company.  On December 16, 2011, RSC Holdings and United Rentals, Inc., which traded on the NYSE under the stock ticker symbol "URI" ("United Rentals"), jointly announced that United Rentals had agreed to acquire RSC Holdings for $18 per share in cash and stock.  After the announcement, the price of RSC Holdings stock increased from $11.37 per share to $17.95 per share by the end of the day on December 16, 2011 (a nearly 58 percent increase).

---

[2] It should be noted that a review of telephone records indicates LONDON and Shaw frequently made contact telephonically, and not solely prior to and after public company announcements. Unless otherwise noted, referenced telephone calls between LONDON and Shaw took place on their cellular telephones.

13.     I also reviewed telephone records which showed calls between LONDON and Shaw on December 6, 2011 and December 12, 2011.  On the same day as the December 12 call, brokerage records showed that Shaw deposited approximately $30,000 into the Fidelity investment account.  After additional calls between LONDON and Shaw on December 14, 2011, Shaw moved another $130,000 from a Fidelity money market account into the Fidelity investment account, and began to purchase a substantial number of shares of RSC Holdings stock.

14.     Telephone records reflect that Shaw and LONDON spoke several times in the morning on December 16, 2011, after United Rentals' acquisition of RSC Holdings was announced to the public.  Records from the Fidelity investment account show that Shaw sold his shares of RSC Holdings between December 19, 2011 and December 21, 2011, for a total profit of more than $190,000.

(3)     Shaw's Suspicious Trades in Pacific Capital Bancorp Between February 2012 and April 2012

15.     During the time period relevant to this complaint, Pacific Capital Bancorp was a bank holding company located in Santa Barbara, California and was a publicly-traded company listed on the Nasdaq National Market under the ticker symbol "PCBC."  On March 12, 2012, UnionBanCal Corporation and its primary subsidiary Union Bank N.A. (collectively referred to herein as "Union Bank") announced that it had agreed to acquire Pacific Capital Bancorp for $46 per share in cash.  On March 12, 2012, after the announcement, the price of Pacific Capital Bancorp shares increased from $28.69 per share from the close of the previous day to $45.03 per share at the close on March 12, an increase of approximately 57 percent.

7

16. Telephone records for LONDON and Shaw show that LONDON and Shaw spoke several times by telephone between February 1, 2012 and February 3, 2012. Trading records for the Fidelity investment account reflect that Shaw began buying shares of Pacific Capital Bancorp in that account on February 3, 2012. Between February 3, 2012 and March 11, 2012, brokerage records reflect that Shaw purchased a large number of shares and call options of Pacific Capital Bancorp in the Fidelity investment account. Telephone records also reflect that LONDON and Shaw spoke by telephone approximately 31 times between February 10, 2012 and March 6, 2012. On March 12, 2012, after the acquisition of Pacific Capital Bancorp was announced, LONDON called Shaw for approximately five minutes.

17. Between March 12, 2012 and April 24, 2012, records reflect that Shaw sold his shares and call options of Pacific Capital Bancorp for a combined gain of at least $365,000.

(4)     Shaw's Suspicious Trades in Deckers Outdoor in April 2012 and May 2012

18. During the time period relevant to this complaint, Deckers was a publicly traded company listed on the Nasdaq National Market under the ticker symbol "DECK."

19. Telephone records for LONDON and Shaw show calls between them on April 17 and April 18, 2012. Trading records for the Fidelity investment account show that between April 18, 2012 and April 23, 2012, Shaw purchased a small number of put options in Deckers. Telephone records for LONDON and Shaw show that LONDON and Shaw spoke twice on April 25, 2012. After those calls, Shaw purchased more put options in Deckers. Telephone and brokerage records show that LONDON and Shaw spoke again the following day, and that Shaw again purchased several put options in the Fidelity investment account in Deckers.

8

20.     After the market closed on April 26, 2012, Deckers announced its financial results for the first fiscal quarter of 2012. After this announcement, the price of Deckers stock dropped from the close of $69.46 on April 26, 2012 to $51.83 at the close of the market the following day. Telephone records show that in the morning on April 27, 2012, LONDON and Shaw spoke for approximately two minutes. After that call, Shaw began selling the put options in Deckers in the Fidelity investment account. Between April 27, 2012 and May 1, 2012, Shaw sold his put options in Deckers for a total profit of at least $240,000. On May 1, 2012 and May 2, 2012, after Shaw had closed positions in Deckers stock, Shaw and LONDON spoke by telephone several times.

(5)     Other Suspicious Trades by Shaw

21.     Based on my review of trading records for Shaw in the Fidelity investment account, I believe that Shaw traded heavily in advance of other earnings announcements for Herbalife, Skechers, and Deckers.

**B.     Shaw's February 8, 2013 Interview at the United States Attorney's Office**

22.     On February 8, 2013, Shaw agreed to be interviewed at the United States Attorney's Office in Los Angeles. Shaw's attorney was present at that meeting. I participated in that interview, along with FBI Special Agent Brian Schnese, a prosecutor from the United States Attorney's Office, and two attorneys from the SEC. During that interview, Shaw told us the following, among other things:

a.     Shaw resides in the Central District of California and runs a jewelry business. Shaw said that he and LONDON were friends and socialized frequently. Shaw said that LONDON was a managing partner at the accounting firm KPMG and was in charge of

9

KPMG's audit practice for the Southwestern United States. Shaw said that LONDON was also the partner responsible for several KPMG clients, including Herbalife and Skechers. LONDON additionally had access to confidential information for other KPMG clients, including Deckers.

b.      Shaw said that starting in 2010, LONDON began to disclose confidential information to Shaw about KPMG clients, which Shaw would then use to make profitable securities trades before the confidential information was disclosed to the public. Shaw estimated that from approximately mid-2010 through mid-2012, LONDON disclosed confidential information to Shaw about KPMG clients approximately eight to ten times. Shaw said that LONDON told him that he had access to press releases for certain KPMG clients before those press releases were announced to the public. For certain companies, LONDON would call Shaw two to three days before the press releases were announced and read the releases to Shaw.

c.      Shaw said that LONDON knew that Shaw was making securities trades based on the confidential information given to him by LONDON. Shaw said that after certain press releases were made public, he spoke with LONDON and asked him when he should sell the stock. LONDON often told Shaw that he had made money, and should just sell the stock rather than hold onto it.

d.      Shaw said that, in return for LONDON disclosing the confidential information, Shaw gave LONDON cash and jewelry – usually about ten percent of his overall profits from the illegal securities trades. Shaw said that he always gave the cash to LONDON in person, often arranging to meet with LONDON in a side street behind Shaw's business to hand off the cash. Shaw typically paid LONDON with $100 bills wrapped in $10,000 bundles. He

said LONDON would usually remark that Shaw was too generous and did not have to pay him for the information, but LONDON always took the cash that was offered to him.

        e.      Shaw said he also bought expensive meals and paid for concert tickets for LONDON, including tickets to a Bruce Springsteen concert. Shaw estimated that he spent between $25,000 and $45,000 on concert tickets for himself and LONDON. Shaw also said that he gave LONDON a Rolex Daytona Cosmograph watch worth an estimated $12,000 in 2011 in exchange for certain confidential information that LONDON provided him about a particular KPMG client.

        f.      Shaw said that LONDON disclosed the following confidential information about KPMG clients, among other confidential information:

        (1)    <u>Herbalife</u>. Shaw said that LONDON first passed confidential information about Herbalife to Shaw in early 2011. Shaw estimated that he received confidential information from LONDON, and traded based on that information, over approximately six fiscal quarters after that.

        (2)    <u>RSC Holdings</u>. In approximately December 2011, LONDON called Shaw and told him that United Rentals was going to acquire KPMG client RSC Holdings. Shaw recalled that LONDON was in Arizona at the time and had just spoken with two KPMG managing partners who had been told about the takeover. Shaw said that after the call from LONDON, he began to buy shares of RSC Holdings in increments of a few hundred shares at a time. Shaw stated that he expressed concerns to LONDON about trading in advance of a corporate merger, but LONDON told him not to worry because regulators were not looking for "small fish." On the day that the acquisition of RSC Holdings was announced, LONDON called

Shaw and stated that "they" (meaning Shaw and LONDON) had done well. Shaw then arranged with LONDON to come over to Shaw's business so that he could pay LONDON cash for the information about the RSC Holdings acquisition. Shaw estimated that he made approximately $200,000 in profits from his trades in RSC Holdings stock based on the confidential information provided by LONDON.

(3)    Deckers. Shaw estimated that he received confidential information from LONDON about Deckers, and made securities trades based on that confidential information, in 2010. He believed that he received inside information from LONDON about Deckers over a much shorter time period than he did for Herbalife.

(4)    Skechers. Shaw said that he received inside information from LONDON regarding Skechers, and traded based on that inside information, over a period of one or two fiscal quarters. He recalled that he lost money on some of these trades in July 2011.

(5)    Pacific Capital Bancorp. Shaw said that LONDON also disclosed confidential information about the acquisition of KPMG's client Pacific Capital Bancorp by Union Bank. Shaw said that after LONDON initially told him that Union Bank might acquire Pacific Capital Bancorp, he contacted LONDON and asked whether the merger was actually going to take place. LONDON told him that it was likely, but told Shaw that he would need to see the press release so that he could be absolutely certain that the merger was going to go through. Shaw said that his securities trades based on confidential information from LONDON about the upcoming merger generated approximately $450,000 in profits. Shaw said that he later gave LONDON approximately $25,000 to $30,000 in cash in return for the confidential information.

f.      In all, Shaw estimated that he made approximately $1 million in profits from securities trades based on the confidential information that he had received from LONDON.  Shaw did not tell LONDON how much he had profited from the trades based on the inside information provided by LONDON, and LONDON did not ask Shaw about his exact profits.

g.      Shaw said that in approximately July 2012, he received a notice from Fidelity Brokerage Services that Fidelity was putting a hold on his investment account.  Shaw said that he immediately called LONDON and expressed his concern that their insider trading had been discovered.  Shaw said that LONDON reassured him that there was no reason for concern, and explained that insider trading was like counting cards at a casino in Las Vegas -- if you were caught, they simply ask you to leave because they cannot prove it.  Shaw said that he later met with LONDON and again raised his concern about Fidelity closing the investment account.  LONDON repeatedly assured Shaw that they were not going to get caught.

h.      Shaw said that sometime in January 2013, LONDON had called him and told him that Herbalife would be a good stock to buy.

## C.      Shaw's Recorded Conversations and Meetings with LONDON

23.      Following Shaw's interview with the government on February 8, 2013, he voluntarily agreed to cooperate in the government's investigation.  Specifically, at the direction of the FBI, Shaw agreed to record in-person meetings and telephone calls with LONDON.  Additionally, on at least two occasions, the FBI provided Shaw with cash to pay to LONDON in exchange for material, non-public information LONDON had obtained as a result of his position

13

at KPMG.  Provided below is a summary of some, but not all, of the conversations that Shaw recorded with LONDON at the direction of the FBI.[3]

        (1)     February 14, 2013 Recorded Telephone Call Between LONDON and Shaw

24.      On February 14, 2013, Shaw made a consensually recorded telephone call to LONDON.  Special Agent Brian Schnese and I were present during this telephone call, and I later reviewed a recording of the call.  Based on my discussions with Shaw, as well as my review of the recording, I know that Shaw and LONDON discussed the following, among other things, during this call:

        a.      LONDON and Shaw discussed the upcoming earnings announcement for Herbalife, which was scheduled to be released several days later on February 19, 2013.  LONDON told Shaw that "they [meaning Herbalife] guided up from where they were," and added that "the numbers are slightly better than the street's estimates ... and they are raising the guidance."

        b.      Shaw asked LONDON whether he should buy the stock, and LONDON said that typically the stock price would go up based on the earnings that were going to be released, but that the stock was very volatile so it was hard to know.  LONDON again confirmed that the guidance was going to be raised, but said he would "find out exactly."  Later in the call, Shaw asked "if the guidance is better ... common sense would say the stock would have to go

---

[3] Unless otherwise noted, wherever in this affidavit I assert that a statement was made, I either heard the statement directly, listened to a recording of the statement, or the statement was reported to me by a federal agent or Shaw.  Such statements are reported in substance rather than verbatim, unless otherwise indicated.  Quoted portions of certain recorded conversations between Shaw and LONDON summarized in this affidavit are based on my preliminary review of recordings of those conversations and are not verbatim transcripts of what was said.

up." LONDON responded, "I'll find out, I'll ask my team just to send me ... what the guidance, what they're, how they're raising it." Shaw asked "and that'll make a big difference?" And LONDON confirmed "yeah."

   c.  Shaw also asked LONDON about the earnings release for Deckers, which was scheduled to be released two weeks later on February 28, 2013. LONDON responded "I'll have to find out on that one."

   (2)  <u>February 19, 2013 Recorded Telephone Calls Between LONDON and Shaw</u>

  25.  On February 19, 2013, Shaw made a series of consensually recorded telephone calls to LONDON.[4] I later reviewed a recording of the calls. Based on my discussions with Shaw, as well as my review of the recordings, I know that Shaw and LONDON discussed the following, among other things, during the calls:

   a.  LONDON told Shaw that he was on his way to Herbalife to give them approval to issue their numbers later that day. Shaw told LONDON that he was willing to get back into things "and make both of us some money." Shaw asked LONDON if he had any information about the Herbalife earnings release that was going to be announced after the stock market closed later that day. LONDON responded that "they [meaning Herbalife] beat their numbers and they're raising their guidance." LONDON told Shaw that he believed that Herbalife's stock would go up, but that he was concerned about hedge fund manager Bill Ackman driving down the price of the stock. LONDON told Shaw that there would be later

---

[4] These telephone calls were made in quick succession because Shaw's telephone dropped the call several times, and he immediately called LONDON back after each time the call was dropped. Essentially, the calls constituted one extended conversation between LONDON and Shaw.

opportunities that would be better, telling him that because of Ackman's activities with Herbalife's stock, that they should "take a pass on this one."  Shaw nevertheless told LONDON that he may buy a little bit of Herbalife's stock, and LONDON confirmed for him that Herbalife was raising its guidance. [5]

        b.      LONDON and Shaw discussed how the stock price for Herbalife had jumped recently when Carl Icahn bought a large block of its stock.  Shaw told LONDON, "I wish you would've known that he was going to release that and we could've made some money."  LONDON responded, "Yeah, that would've been nice."

        c.      LONDON then referenced rumors that had been spread recently about Herbalife going private, which had been discussed in various news reports.  LONDON stated, "That is going to be where you make a ton of money ... because, you know, we'll know that."  LONDON then advised that if that were to take place, "what we oughta do is, when I know that it's gonna start happening, what you do is you start just buying in small blocks, right, so it doesn't draw attention and then, you know, then it doesn't look unusual at all."

        (3)      <u>February 19, 2013 Herbalife Earnings Release</u>

26.      On February 19, 2013, Herbalife issued a press release, that I later reviewed, which stated, "Herbalife Ltd. announces record fourth quarter 2012 and record full year results, and raises 2013 earnings guidance."

        (4)      <u>February 20, 2013 Recorded Telephone Call Between LONDON and Shaw</u>

27.      On February 20, 2013, Shaw made a consensually recorded telephone call to LONDON.  I later reviewed a recording of the call.  Based on my discussions with Shaw, as well

---

[5] Shaw was directed by the FBI to not actually place any securities trades in Herbalife.

16

as my review of the recording, I know that Shaw and LONDON discussed the following, among other things, during the call:

a.    Shaw asked LONDON if he was available tomorrow to come by so that Shaw could give him "a little cash." LONDON told Shaw that "you don't need to do that," and Shaw responded that he would feel better "just because we haven't done anything in six or seven months."

b.    Shaw told LONDON that he was optimistic about the upcoming earnings release for Deckers, telling LONDON he had a feeling that "we're gonna make some money in Deckers." LONDON told Shaw that he would "do some research tomorrow on Deckers" when he was in the office.

d.    Again referencing public rumors that Herbalife could potentially go private, LONDON told Shaw that "we're gonna make money" when that happened. Shaw responded "I know that – why do you think I'm paying you?" LONDON laughed in response.

(5)    <u>February 21, 2013 Recorded Telephone Call Between LONDON and Shaw</u>

28.    On February 21, 2013, Shaw made a consensually recorded telephone call to LONDON. I later reviewed a recording of the call. Based on my discussions with Shaw, as well as my review of the recording, I know that Shaw and LONDON discussed the following, among other things, during the call:

a.    LONDON and Shaw again discussed public rumors that Herbalife could at some point in the future go private. Shaw told LONDON that he may start accumulating a little bit of the stock at a time before any public announcement. LONDON agreed, advising "that way you're not buying in 24 hours before the thing goes. That's the stuff that gives rise to ... uh ...

17

you know ... something unusual." Later during the call, Shaw told LONDON, "I will go and start purchasing. If you hear something, give me a buzz."

      b.     Regarding Deckers, LONDON told Shaw that "the release is okay, it's not great ... They beat their numbers slightly." LONDON told Shaw that he had just been talking with the CFO a little while ago and would find out if they were raising their guidance.

      (6)     February 21, 2013 Meeting Between LONDON and Shaw

29.     Later that day on February 21, 2013, acting at the direction of the FBI and under surveillance by federal law enforcement agents, Shaw conducted a consensually recorded in-person meeting with LONDON. I participated in the surveillance of this in-person meeting and later reviewed the recording of the meeting between LONDON and Shaw in Encino, California. In advance of the meeting, agents from the FBI provided Shaw with $5,000 in cash, which was placed into a manila envelope and then wrapped inside a black paper bag, which was consistent with how Shaw had described his concealing previous cash payments he had made to LONDON. I was present during these preparations. Shaw was then observed meeting with LONDON on a side street handing LONDON the black bag containing the cash. FBI agents conducting surveillance of the meeting took photographs of Shaw passing the bag of cash to LONDON.

30.     Based on my discussions with Shaw, as well as my review of the recorded meeting, I learned that when Shaw handed the envelope of cash to LONDON, Shaw told LONDON that the bag had "five," meaning $5,000. Referencing the payment, LONDON joked that "now the pressure is on." LONDON and Shaw then discussed how Shaw could potentially make money by trading in Herbalife in the future.

18

(7)     February 28, 2013 Recorded Telephone Calls Between LONDON and
        Shaw

31.     On February 28, 2013, Shaw made a series of consensually recorded telephone

calls to LONDON.[6] I later reviewed a recording of the calls.  Based on my discussions with

Shaw, as well as my review of the recordings, I know that Shaw and LONDON discussed the

following, among other things, during the calls:

        a.     LONDON told Shaw that he had talked with the partners who handled the

KPMG account for Deckers.  LONDON then told Shaw that Deckers "basically made their

numbers for the fourth quarter and, um, then, next year's guidance ... what I don't know, and I

couldn't see the press release, is that they're guiding next year to be, the net income to be five to

seven percent higher than it was this year."  LONDON indicated that he was not sure if the

guidance for Deckers had already been built into the estimates on Wall Street.  LONDON stated

"they're beating the estimates, but not significantly so, you know, for 2012, so it's just tough to

say if the thing is gonna move."

        b.     Shaw asked LONDON, regarding Deckers stock, if "it could go up a little

bit?"  LONDON responded, "It could go up a little bit."  LONDON said he was not sure how the

stock would respond.  Shaw then asked LONDON if he agreed they should "buy a little, if it

goes up, then we made a little money."[7]  LONDON responded, "Yeah ... I think that's fine."

---

[6] These telephone calls were made in quick succession because Shaw's telephone dropped the
call several times, and he immediately called LONDON back after each time the call was
dropped.  Essentially, the calls constituted one extended conversation between LONDON and
Shaw.

[7] Shaw was directed by the FBI to not actually place any securities trades in Deckers.

(8)     February 28, 2013 Deckers Earnings Release

32.     On February 28, 2013, after the market closed, Deckers issued a press release,
that I later reviewed, which stated "Fourth quarter sales increased 2.2% to a record $617.3
million; Company reports fourth quarter diluted earnings per share of $2.77; Fiscal 2012 sales
increased 2.7% to a record $1.414 billion; Company reports fiscal 2012 diluted earnings per
share of $3.45."

(9)     March 4, 2013 Recorded Telephone Calls Between LONDON and Shaw

33.     On March 4, 2013, Shaw made a series of consensually recorded telephone calls
to LONDON.[8]  I later reviewed a recording of the calls.  Based on my discussions with Shaw, as
well as my review of the recordings, I know that Shaw and LONDON discussed the following,
among other things, during the calls:

        a.      Shaw told LONDON that "we made a little money on Deckers."
LONDON responded that he had predicted the stock would go up "maybe two [to] three bucks ...
it's up like seven [to] eight bucks now."  LONDON said "their release was good, but it wasn't
great ... I just didn't think it was gonna go up that much."

        b.      Shaw told LONDON that he was waiting for a check to clear and told
LONDON he would like to "take care of you on Deckers."  LONDON responded "yeah ... you
gonna sell?"  Shaw told LONDON "you tell me," and LONDON advised Shaw that he
(LONDON) would sell if it were him, stating "just take and go ... that way you just, you know,

---

[8] These telephone calls were made in quick succession because Shaw's telephone dropped the
call several times, and he immediately called LONDON back after each time the call was
dropped.  Essentially, the calls constituted one extended conversation between LONDON and
Shaw.

you don't give anything away." Shaw responded "I will get you some cashola" and they agreed
to meet on March 7.

        (10)    <u>March 7, 2013 Meeting Between LONDON and Shaw</u>

    34.    On March 7, 2013, Shaw, acting at the direction of the FBI and under surveillance
by federal law enforcement agents, conducted a consensually recorded in-person meeting with
LONDON. I participated in the surveillance of this in-person meeting and later reviewed the
recording of the meeting between Shaw and LONDON. In advance of the meeting, agents from
the FBI provided Shaw with $5,000 in cash, which was placed into a manila envelope and then
wrapped inside a black paper bag, which was consistent with how Shaw had described
concealing previous cash payments he had made to LONDON. I was present during these
preparations. Shaw was also outfitted with a body recorder, which recorded sound as well as
video. Then, while under surveillance by FBI agents, Shaw met LONDON in the parking lot of
a Starbucks café. After the meeting, I reviewed the video and audio recording of the meeting
between LONDON and Shaw. Based on my discussions with Shaw, as well as my review of the
recordings, I know that Shaw and LONDON discussed the following, among other things, during
this meeting:

        a.    Shaw told LONDON "sorry, this is five," meaning only $5,000. He then
handed the bag containing $5,000 in cash to LONDON. FBI agents conducting surveillance of
the meeting took photographs of Shaw passing the bag of cash to LONDON. A copy of one of
the photographs is attached to this affidavit as <u>Exhibit A</u>.

        b.    Shaw then told LONDON "I think we made a little bit more on Deckers
than we anticipated," but told him that it was hard to get cash out to pay LONDON more than the

amount that he had brought to the meeting. LONDON told Shaw not to worry, and to keep the money, stating that they would "figure it out later, another time." Nevertheless, LONDON accepted the envelope containing the $5,000 in cash from Shaw.

        c.      Shaw told LONDON that he still needed to sell options he'd bought for Deckers and asked what LONDON thought. LONDON told Shaw that the market could not have been any better for them and noted that it just kept going up. Shaw then asked LONDON, "Sell it and take the profits?" LONDON responded, "Yeah, sell it and take the profit ... trust me, we're gonna have, we'll have more, more, um, you know, opportunities, so why risk losing anything of the profit that you got."

**D.**      **March 20, 2013 FBI Interview with LONDON**

35.     On March 20, 2013, I interviewed LONDON at his residence, along with FBI Special Agent Brian Schnese. During that interview, LONDON was told that the FBI was aware of his insider trading activity with Shaw. LONDON stated during the interview that Shaw was the only person who he had passed information to, and said that "there's nobody else."

**E.**      **LONDON's April 3, 2013 Interview at the United States Attorney's Office**

36.     On April 3, 2013, LONDON agreed to be interviewed at the United States Attorney's Office in Los Angeles. LONDON's attorney was present at that meeting. I participated in that interview, along with FBI Special Agent Brian Schnese, a prosecutor from the United States Attorney's Office, and two attorneys from the SEC. During that interview, LONDON told us the following, among other things:[9]

---

[9] Before the interview, the United States Attorney's Office for the Central District of California ("USAO") entered into a written agreement with LONDON regarding limited use immunity for his statements during the interview. After that meeting, LONDON advised the USAO through

a.    LONDON started at KPMG in Los Angeles, within the Central District of California, in 1984 and had been employed there nearly 30 years.  He stated that he supervised approximately 53 audit partners and approximately 500 professionals (most of whom were CPAs) at KPMG.  LONDON acknowledged that he regularly received ethics training at KPMG and said that he knew that he was required to keep certain information about KPMG's clients confidential, including earnings and guidance information for KPMG's clients before that information was announced to the public.

b.    LONDON admitted that he had passed confidential information to Shaw regarding Herbalife, Deckers, Skechers, RSC Holdings, and perhaps Pacific Capital Bancorp. He believed that he had started passing confidential information to Shaw beginning in at least 2009 or 2010.  LONDON said that he knew that it was wrong to disclose this information to Shaw, and that Shaw was using the confidential information to make securities trades in the stock of those companies.  LONDON also admitted that Shaw paid him cash after the confidential information was announced to the public, and Shaw had sold his stock or liquidated his position in the stocks and made his profits from the information.  LONDON said he believed the dollar amounts were small enough that they (meaning he and Shaw) would not get caught.

c.    LONDON estimated that, in all, Shaw paid him approximately $50,000 in cash for the confidential information.  LONDON estimated that he believed that Shaw had traded approximately 12 to 14 times on the confidential information that LONDON had provided.

d.    LONDON emphatically denied ever disclosing confidential information about KPMG clients to anyone other than Shaw.

his counsel, that he would not object to having his statements made at the interview disclosed in this complaint affidavit.

23

## CONCLUSION

37.     Based on the facts set forth above, and my training and experience, I believe that probable cause exists to believe that from at least in or about November 2010 and continuing through in or about May 2012, LONDON violated Title 18, United States Code, Section 371, by conspiring to commit securities fraud through insider trading.


_/s/_

_____
JEREMY R. TARWATER
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on
The 11th day of April, 2013.

### CHARLES F. EICK

_____
UNITED STATES MAGISTRATE JUDGE

# **EXHIBIT A**

